IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOANNE REHMEYER | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| PEAKE PLASTICS CORPORATION, et al | : | NO. 16-5690 |

# **MEMORANDUM AND ORDER**

In this products liability action, Plaintiff, Joanne Rehmeyer ("Plaintiff"), asserts claims of negligence, strict liability, and breach of warranty against Model Pattern Company, Inc. ("MP"), Parker-Hannifin Corporation ("Parker"), and Sidener Engineering Company ("Sidener") (collectively, "Defendants"), arising from personal injuries sustained at her workplace in Felton, Pennsylvania. Doc. 1.[1] Presently before the court is Plaintiff's motion to compel MP to produce certain documents (Doc. 58), MP's response thereto (Doc. 59), and subsequent letters (Docs. 63 & 64). For the reasons stated herein, the motion will be granted in part and denied in part.

---

[1] Defendant Sidener Engineering Company, Inc., is now SEC Ventures, Inc. ("SEC Ventures"). See Doc. 55 (SEC Ventures' answer to cross-claim of Defendant Model Pattern Company, Inc.), at 1. To date, the docket has not been changed to reflect the corporate name change.
  In addition, two other defendants are named in the Complaint but have not participated in the litigation. Default has been entered against Defendant Peake Plastics Corporation ("Peake") for its failure to appear or otherwise defend this action, and Plaintiff's motion for default judgment remains pending. Docs. 35 & 36. Similarly, Defendant Autoform, Inc. ("Autoform") has not appeared or otherwise defended this action.

I.      **BACKGROUND**

The Complaint alleges that on November 7, 2014, Plaintiff was injured while working on a trim press in the course of her employment with automotive parts maker Key Plastics, Inc. ("Key Plastics"), when the top portion of the trim press disconnected from its cylinder and descended, causing hand injuries. See Complaint, Doc. 1-2 ("Complaint") ¶ 47. The trim press system at issue contained a hydraulic press connected to a top platen and top die (also referred to as a trim die) by way of a threaded cylinder. See Press System photograph, attached to Doc. 58 at Exh. A. It is not disputed that Defendant MP designed, manufactured, and sold the trim die, which is a component part of the trim press used to shape materials being cut, but MP denies that it had any role in the design, maintenance, or inspection of the press itself. See Doc. 58 ¶ 1; Doc. 59 ¶¶ 1, 9.

On August 18, 2016, Plaintiff initiated this products liability lawsuit in the Philadelphia Court of Common Pleas, alleging parallel claims of negligence, strict liability, and breach of warranties against Defendants. See Complaint. On October 25, 2016, Defendant Parker filed a notice of removal to the United States District Court for the Middle District of Pennsylvania, and that court subsequently transferred the matter to this court where it was assigned to the Honorable Harvey Bartle, III. The parties consented to my jurisdiction on March 3, 2017, and on March 31, 2017, I issued a Scheduling Order with a fact discovery deadline of February 2, 2018. Docs. 39 & 44.

Meanwhile, on February 1, 2017, MP served its Initial Disclosures. See Initial Disclosures, Doc. 58-2 (partial) ("Initial Disclosures"). On May 19, 2017, Plaintiff

2

served MP with Interrogatories and Requests for Production of Documents. See Requests for Production, Doc. 58-6 ("Requests"). The Requests define the "date of incident" as November 7, 2014, and "product" and/or "subject product" as "the 31XX Console Production Trim Die, Part No. 22960353, MPL Job. No. 3B94 and parts thereto" – that is, the date of the incident which caused Plaintiff's injury, and the trim die involved in the incident. Requests at 2. The Requests also define the relevant time period as being "from the date of first sale of the product of the same model type as the product at issue, to the present." Id.

MP responded to the Requests on June 22, 2017. See Response, Doc. 58-6 (Exh. E) ("Response"). By letter dated June 30, 2017, Plaintiff's counsel informed MP that she considered the Response to be deficient, non-responsive, argumentative, and improperly objected to. See 06/30/17 letter, Doc. 58-6 (Exh. F). By letter dated August 8, 2017, but dictated on July 25, 2017,[2] MP supplemented its response. See Supplemental Response, Doc. 58-6 (Exh. G); Doc. 59-1 ("Supp. Response"). Without further correspondence between the parties, on August 31, 2017, Plaintiff filed the present motion seeking to compel production of documents which Plaintiff believes exist based in part on documents provided by MP in its Initial Disclosures. Doc. 58. In its response filed the next day, MP denies that it is possession of any additional responsive documents and argues that certain of the requests are improper. Doc. 59.

---

[2] The delay between counsel's dictation and sending of the supplemental response was due to the death of her father. Doc. 59 ¶ 6.

Following a teleconference with counsel on September 13, 2017, I gave the parties two weeks to notify the court as to the status of this discovery dispute. By letter dated September 27, 2017, Plaintiff informed the court that the issues raised in the motion remain outstanding, and MP responded by letter dated September 29, 2017. See Doc. 63 & 64. Read together, the letters essentially restate the parties' prior positions.

**II.     APPLICABLE LAW**

The scope and limits to discovery are governed by Rule 26(b) of the Federal Rules of Civil Procedure, which permits the parties to

> obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). A party's response to each document request must either state that the documents will be produced or "state with specificity" the grounds for objecting. Id. R. 34(b)(2)(B). An objection to a request for production of documents "must state whether any responsive materials are being withheld on the basis of that objection," and an objection to part of such a request "must specify the part and permit inspection of the rest." Id. R. 34(b)(2)(C). A party must provide documents as they are kept in the ordinary course of its business or organized and labeled to correspond to the categories in the requests. Id. R. 34(b)(2)(E)(i).

"[T]he discovery rules are meant to be construed liberally so as to permit the discovery of any information which is relevant and is reasonably calculated to lead to the discovery of admissible evidence." Hoffman v. Champion Power Equip., Inc., No. 15-1828, 2017 WL 2535954, *1 (M.D. Pa. June 12, 2017) (quoting Fid. Fed. Sav. & Loan Ass'n v. Felicetti, 148 F.R.D. 532, 534 (E.D. Pa. 1993)). "As an initial matter, therefore, all relevant material is discoverable unless an applicable evidentiary privilege is asserted. The presumption that such matter is discoverable, however, is defeasible." Id. (quoting Pearson v. Miller, 211 F.3d 57, 65 (3d Cir. 2000)). In the context of a products liability claim against a manufacturer, relevant information and documents include those regarding engineering designing or manufacturing of the product, knowledge or foreseeability of dangers, safety tests conducted, and alternative designs considered. Fassett v. Sears Holdings Corp., 319 F.R.D. 143, 150 (M.D. Pa. 2017) (internal citations omitted); see also Tincher v. Omega Flex, 104 A.3d 328 (Pa. 2014) (Pennsylvania applies risk-utility test in product liability law, which includes feasibility and cost of alternative designs).[3]

### III. DISCUSSION

In the present motion, Plaintiff seeks to compel production of documents in connection with seven requests – specifically, Request Nos. 27, 29, 37, 39, 47, 48, and

---

[3] As a case brought to federal court on grounds of diversity, there is no apparent dispute that Pennsylvania substantive law applies.

49. Except as noted below, I will consider these in numerical order, rather than in the order presented in Plaintiff's motion.[4]

Request No. 27

In Request No. 27, Plaintiff requested the "Complete list of drawings for the product." Requests ¶ 27. Defendant MP initially responded with reference to "documents previously produced under separate cover of letter by [MP] as part of its required Initial Disclosures. . . ." Response ¶¶ 25-29. In its supplemental response, MP referred to a prior response which again referenced documents already provided in its Initial Disclosures, and then stated: "By way of additional response, a duplicate, 'full size' drawing of page 86 of the Initial Disclosures is enclosed with this correspondence." Suppl. Response at Page Two.

Plaintiff argues that the single drawing provided by MP in response to this request identifies component parts of the trim die, identified as a 31XX Console, but that MP has failed to provide drawings for the trim die's component parts. Doc. 58 ¶ 36; page 25 (ECF pagination). MP counters that it "has provided any and all drawings for the trim die at issue it can locate at this time," noting that additional drawings were provided in its Initial Disclosures. Doc. 59 ¶¶ 34-35. In light of this response, Plaintiff's motion will be

---

[4]As a general matter, I note that certain of MP's objections reflected in its discovery responses are improper, for example directing Plaintiff to seek the information from other sources or arguing the merits of Plaintiff's claims.

denied as to Request No. 27, with the caveat that MP must supplement its responses if any drawings of the trim press or its component parts are discovered.[5]

Request No. 29

In Request No. 29, Plaintiff requested "Minutes or notes of any and all meetings concerning the subject product." Requests ¶ 29. Defendant MP's initial response was the same as for Request No. 27, supplemented as follows: "See; emails by/between [MP] and representatives of Key Plastics . . . and, possibly, others, which have already been produced as part of [MP's] Initial disclosures." Supp. Response at Page Two.

Plaintiff argues that MP's responses to not indicate whether there are internal minutes or notes of discussions held by MP regarding the trim die it supplied to Key Plastics, and that MP's responses are therefore incomplete. Doc. 58 ¶ 30; page 25 (ECF pagination). Defendant MP has repeatedly insisted that it has "already produced any and all emails by and between [MP] and representatives of Key Plastics," and avers that there are no internal minutes or notes responsive to this request, and "if there were such meeting minutes or notes, same would have been produced." See Doc. 59 ¶¶ 28-30. As a result, Plaintiff's motion will be denied as to Request No. 29, with the caveat that MP must supplement its responses if any responsive documents are discovered.

---

[5]By letter dated September 27, 2017, Plaintiff's counsel indicates that she requested an Affidavit from MP's President to the effect that MP does not have additional documents responsive to Requests 27, 29, and 39. Doc. 63 at 1. Such a request is neither required by the Federal Rules of Civil Procedure, nor appropriate under the circumstances.

7

Request Nos. 37, 47, 48, and 49

Plaintiff addresses these four requests together because they each concern MP's knowledge and design of guarding methods for trim dies, and because Defendant MP raised similar challenges to each. See Doc. 28 at 22 (ECF pagination). In Request No. 37, Plaintiff requested "Design drawings for any guards, restraints, or other safety devices used by [MP] for other trim press dies sold or designed by [MP]." Requests ¶ 37. In Request No. 47, Plaintiff requested "Any and all documents showing and/or reflecting [MP's] knowledge of guards for trim dies before 2014." Id. ¶ 47. In Request No. 48, Plaintiff requested "Any and all documents reflecting and/or showing [MP's] use of limit switches in a trim die before 2014." Id. ¶ 48. Finally, in Request No. 49, Plaintiff requested "Any and all documents reflecting and/or showing [MP's] use of devices to eject scrap from a trim die before 2014." Id. ¶ 49.

Defendant MP initially responded to Request No. 37 with reference to documents it previously produced as part of the Initial Disclosures, see Response ¶¶ 32-37. MP responded to Requests Nos. 47 through 49 inclusively, as follows:

> 47-50. Use of limit switches, devices to eject scrap from a trim die, is the duty and obligation of the installer and press user, in this case, Plaintiff's employer. The trim die manufactured by [MP], in accordance with the specifications and design elements of Plaintiff's employer, Key Plastics, Inc., could not be "guarded" and did not need to be "guarded." The trim die, itself, is inanimate; a tool, which did not move in and of itself, and had to be installed into the press, and this was done by Plaintiff's employer.

Response ¶¶ 47-50. In its supplemental response, MP objected to No. 37, stating that it "seeks information which is irrelevant, and is not otherwise reasonably calculated to lead

to the discovery of admissible evidence. Without waiving said objection, [MP] was neither contracted to provide, nor in any way guard the trim die, which is a tool, an inanimate part." Suppl. Response at Page Two. MP also referred to its supplemental responses for Requests Nos. 47 through 49. For each of those requests, MP objected on relevance and overbreadth grounds and because Key Plastics did not "request or contract for the trim die . . . specifically designed for use in its trim press." Id. at Page Three. MP then expanded on its relevance objection to each request, for example stating

> the trim die at issue is, itself, a tool, a part, and in this case, where the trim die is used as/in a cutting applique, where the weight of the die does the cutting of a plastic part, the trim die is not guarded. Nonetheless, the obligation for ensuring that the trim press, itself, is safe for operation, and its parts/components properly guarded is the duty and obligation not of [MP], but Plaintiff's employer.

Id.

I overrule MP's relevance objection. Because Defendant MP knew that its trim die would be used as part of the trim press which caused Plaintiff's injuries, see emails at Doc. 58-6 (Exh. H), documents regarding the type of trim die used by Key Plastics, and MP's trim dies in general, are highly relevant. Such documents would include, for example, information regarding the design and manufacture of the trim die at issue, and whether guards or other safety features exist or have been considered by MP for this or any other type of trim die. Similarly, MP's position that the requests are irrelevant because Key Plastics bore the responsibility for the maintenance and safety of the trim press is inappropriate, as that issue has no bearing on whether MP possesses documents

9

regarding the design and/or manufacture of trim dies and any guarding associated with such dies.

However, this does not end the present inquiry.  Plaintiff notes that MP's supplemental response to Request No. 48 indicates that MP does provide "guarding" to its dies in some circumstances, and that documents related to such guarding are highly relevant.  See Doc. 58 at 7 n.3 (ECF pagination).  In its supplemental response, MP challenges the relevance of other types of dies, for example differentiating a trim die, such as that involved in this case, with "a cam die, where there is a potential risk of the operator getting cut by an exposed, sharp edge of the die," and explaining that whereas a guard could be designed for a die used for cutting, "there is no such risk associated with the instant trim die."  Suppl. Response at Page Three.  The parties restated these positions in their more recent letters to the court, see Docs. 63 & 64, with Plaintiff making the additional argument that MP possesses documents regarding cam dies and that such documents would "seemingly be extremely easy to produce."  Doc. 63 at 2 n.1.

I accept for purposes of analysis that cam dies have sharp edges and trim dies do not, and that therefore the dies have different designs and purposes, and potentially different dangers.  However, the parties have explained that both types of dies attach to cylinders and are put in motion for a myriad of industrial applications.  As a result, guarding utilized for one type of die may be relevant to determine whether similar guarding was feasible for a different type of die.  See, e.g., Horner v. Cummings, Civil Action No. 14-0639, 2015 WL 4590959, at *6 (M.D. Pa. July 29, 2015) (overruling relevance objections with respect to tractor-trailer trucks with different designs and

10

specifications than allegedly defective tractor-trailer because other tractor-trailers utilized "the very design features identified by the plaintiff as alternatives"). Therefore, to the extent there are cam or trim dies for which guards or limit switches have been considered, designed and/or manufactured by MP, such documents are relevant at this stage of the litigation, and must be produced. Admissibility will be determined at a later point.

Lastly, Plaintiff has requested documents in these categories "before 2014." Requests ¶¶ 47-49. Without more information regarding the history of dies or how long MP has been in the business of designing and manufacturing them, it is impossible for the Court to ascertain the breadth of this request. Given advances in workplace safety over the last several decades, however, I conclude that ten years prior to the incident at issue in this case is a reasonable time period, or from November 7, 2004, to November 7, 2014.

Request No. 39

Lastly, in Request No. 39, Plaintiff requested "All correspondence, including all notes, memoranda, or other memorializations of phone conversations, as well as all emails, letters, and faxes with Plaintiff's employer [Key Plastics] and other entities, including Co-Defendants, regarding the subject product supplied to Plaintiff's employer." Requests ¶ 39. Plaintiff initially responded, "To the extent same exist, see; emails previously produced." Response ¶ 39. In its letter dated August 8, 2017, MP supplemented its response as follows: "None, other than what has already been produced as part and parcel of [MP's] Initial Disclosure. To the extent counsel for Plaintiff is looking for 'responsive emails' from Key Plastics, Inc., a subpoena may be issued

11

directly to that entity for same, as [MP] has produced all available and obtainable emails regarding this 'project.'"  Suppl. Response at Page Three.

Plaintiff argues that MP produced only emails from Key Plastics – Plaintiff's employer and the purchaser of MP's trim die – but no emails or correspondence from MP to Key Plastics.  Doc. 58 ¶ 32; pages 25-26 (ECF pagination).  Plaintiff correctly characterizes the non-existence of other emails or phone calls as "unlikely," particularly insofar as Key Plastics asked questions in some of its emails which logically required answers from MP, and in one instance asked for a phone call.  Id.  Nevertheless, as with Request No. 29 above, Defendant MP avers that it has produced all documents responsive to this request, in this instance "its complete and entire 'project file,' including any and all emails by, between, with, up, down, around any other party."  Doc. 59 ¶ 32.  The Court is hardly in position to order a party to produce documents it has averred to the Court do not exist.  As a result, Plaintiff's motion will be denied as to Request No. 39, with the caveat that MP must supplement its responses if any responsive correspondence, notes, memoranda, memorializations of phone conversations, emails, letters, and/or faxes are discovered.

An appropriate Order follows.